**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
TODD KENNEDY (State Bar No. 250267)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 271-6469
Facsimile:  (415) 449-6469

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENA LAUCHUNG-NACARINO, as an individual, on behalf of herself, the general public and those similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>HOSTESS BRANDS, INC; and HOSTESS BRANDS, LLC<br><br>    Defendants. | Case No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING LAW; UNFAIR COMPETITION LAW; AND COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.　　Plaintiff Elena Lauchung-Nacarino, by and through her counsel, brings this class action against Defendants Hostess Brands, Inc. and Hostess Brands, LLC (collectively, "Hostess"), on behalf of herself, the general public, and those similarly situated, for violations of the Consumer Legal Remedies Act, Unfair Competition Law, and False Advertising Law, and for common law fraud, deceit and/or misrepresentation. The following allegations are based upon information and belief, including the investigation of Plaintiff's counsel, unless stated otherwise.

2.　　This case concerns Hostess's false and deceptive labeling, advertising, marketing, and sale of its Hostess Carrot Cake Donettes (the "Product"). Contrary to Hostess's packaging and advertising, and contrary to the Product's appearance and flavoring, the Product contains no "carrot cake." Indeed, carrots are not listed among the ingredients at all.

3.　　No reasonable consumer believes that donuts are health food. But, consumers routinely make decisions to limit the negative effects of eating dessert products. For instance, consumers choose to buy the Product because they believe that it, unlike competing desserts, contains a substantial amount of carrot—an amount sufficient to properly say that the Product is a "carrot cake" dessert.

4.　　Hostess, a sophisticated and well-established manufacturer and marketer of dessert products, knows this to be the case, and deliberately markets the Product in a way that deceives consumers into falsely believing that the Product is healthier than competing desserts.

5.　　Throughout the Class Period, Hostess prominently represented to consumers that the product consists of "Carrot Cake" on the front label panel of all Product boxes, as well as the thin plastic wrappers that encase the Donettes.

6.　　Hostess does not disclose that the Product contains no real carrot cake, or that the carrot-like color and flavor of the Product is manufactured through an artificial process to create a chemical substance that tastes like real carrot. The result is a labeling scheme that is designed to mislead consumers, and which does so effectively.

7.　　That "carrot cake" implies a substantial amount of real carrot is well-recognized by consumers and the food industry. Indeed although there are many manufacturers of "carrot

cake" products on the market, Hostess's Product is the **only** major "carrot cake" product that does not contain a substantial amount of real carrot, without disclosing that to be the case.

**PARTIES**

8.     Elena Lauchung-Nacarino is, and at all times alleged in this Class Action Complaint was, an individual and a resident of San Francisco, California.

9.     Defendant Hostess Brands, Inc. is a corporation existing under the laws of the State of Delaware, having its principal place of business in Kansas City, Missouri.

10.     Defendant Hostess Brands, LLC is a limited liability company existing under the laws of the State of Delaware, having its principal place of business in Kansas City, Missouri.

11.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

12.     At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

13.     At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

14.     At all times herein mentioned, each of the Defendants ratified each and every act or omission complained of herein.

15.     At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class

members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs.

17.     This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

18.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Hostess has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

20.     In accordance with California Civil Code Section 1780(d), Ms. Lauchung-Nacarino concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased the Product in San Francisco, California. (See Exhibit A.)

21.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

**A.     It is Well-Understood by Consumers and Manufacturers in the Food Industry that "Carrot Cake" Products Must Contain a Substantial Amount of Carrot.**

22.     Consumers understand the term "carrot cake" to mean a dessert that contains a substantial amount of real carrot. Indeed, of the first twenty recipes returned by a Google search for "carrot cake recipe," *all* of them contain a substantial amount of carrot—two cups or more per cake:

- https://sallysbakingaddiction.com/my-favorite-carrot-cake-recipe/ (2 cups grated carrots)
- https://www.inspiredtaste.net/25753/carrot-cake-recipe/ (3 cups grated peeled carrots)
- https://www.gimmesomeoven.com/best-carrot-cake/ (1 pound finely grated fresh carrots)
- https://www.allrecipes.com/recipe/7402/carrot-cake-iii/ (3 cups grated carrots)

- https://www.momontimeout.com/to-die-for-carrot-cake-recipe/ (2 cups grated carrots)
- https://www.livewellbakeoften.com/the-best-carrot-cake-recipe/ (3 cups grated carrots)
- https://www.foodnetwork.com/recipes/carrot-cake-recipe-recipe-2011777 (3 cups finely ground carrots)
- https://www.delish.com/cooking/recipe-ideas/recipes/a58283/best-carrot-cake-recipe/ (3 cups grated carrots)
- https://www.bettycrocker.com/recipes/carrot-cake/64acd01e-14ad-4e03-9fe1-b62b03ff4667 (3 cups carrots)
- https://sugarspunrun.com/best-carrot-cake-recipe/ (3 cups grated carrots)
- https://www.joyofbaking.com/CarrotCake.html (3/4 pound peeled carrots)
- https://www.tasteofhome.com/recipes/carrot-cake/ (2 cups finely grated carrots)
- https://tasty.co/recipe/carrot-cake (3 cups grated carrots)
- https://preppykitchen.com/carrot-and-walnut-cake/ (1 pound carrots)
- https://www.cookingclassy.com/best-ever-carrot-cake/ (3 cups finely grated carrots)
- https://cafedelites.com/carrot-cake/ (2 1/2 cups carrots)
- https://www.bonappetit.com/recipe/bas-best-carrot-cake (1 pound carrots)
- https://therecipecritic.com/carrot-cake-recipe/ (3 cups grated carrots)
- https://www.marthastewart.com/356827/carrot-cake (1 pound carrots)
- https://cookiesandcups.com/perfect-carrot-cake/ (2 3/4 cups grated carrots)

(all last accessed August 19, 2020.)

23.     Despite a diligent search, Plaintiff's representative was unable to locate **any** recipe for "carrot cake" that does not contain a significant amount of carrot. Plaintiff's representative did observe, however, that Google provided an answer to the question "What can I substitute for carrots in carrot cake?" The answer was to use zucchini—another vegetable:

What can I substitute for carrots in carrot cake?   ^

Variation: **Zucchini** Cake

Or bread, if baked in a loaf pan. How-to: follow the recipe below but substitute an equal amount of coarsely grated **zucchini** for the carrots and only use ground cinnamon and vanilla extract. You can also add 2 tablespoons of raisins or chopped walnuts/pecans.
Apr 8, 2020

vintagekitchennotes.com › simple-carrot-cake-recipe-with...

Simple Carrot Cake Recipe - with ingredient substitutions! - Vintage ...

(retrieved August 20, 2020.)

24.     Consumers also understand that real carrot cake desserts do not need to contain as much added sugar as typical desserts. This is true because carrots are naturally sweet. In fact, according to food historians, carrot cake "originated during the Middle Ages when sugar and sweeteners were expensive for most individuals and often hard to find, so many people used carrots as a substitute for sugar." (*See* https://www.thefooddictator.com/the-hirshon-ultimate-carrot-cake (last accessed August 24, 2020).)

25.     Accordingly, consumers reasonably understand that a "carrot cake" dessert product is more healthful than a typical dessert product that does not contain any vegetables at all.

26.     With the exception of Hostess, companies in the food industry also appear to understand that "carrot cake" products must contain a significant amount of real carrot—or that the lack of carrot must be clearly disclosed to consumers on the front of the package. Except for Nabisco's "Carrot Cake" Oreos—discussed below—Plaintiff's counsel was unable to identify *any* mainstream "carrot cake" product that does *not* list carrot as an ingredient. The following products, for example, contain real carrot:

- Betty Crocker Super Moist Carrot Cake Mix (ingredient panel lists "carrot powder");

- Larabar Carrot Cake Bars (ingredient panel lists "carrots");

- Duncan Hines Signature Carrot Cake Mix (ingredient panel lists "dehydrated carrots");

- CLIF Bar Carrot Cake Energy Bars (ingredient panel lists "dried carrots");

- Enjoy Life Carrot Cake Baked Chewy Bars (ingredient panel lists "dehydrated carrots");

- Simple Mills Soft Baked Spiced Carrot Cake Almond Flour Bars (ingredient panel lists "carrots");

- Good Dee's Carrot Muffin & Cake Mix (ingredient panel lists "carrots"); and

- Backpacker's Pantry Carrot Cake Pancakes (ingredient panel lists "carrot powder").

27.     The exception is Nabisco's Carrot Cake Oreos. Like the Hostess Product, the "Carrot Cake" Oreos do not contain any carrot, or at least not enough to list it in the ingredients. But, unlike Hostess, Nabisco clearly discloses on the front of the package that its product is merely "CARROT CAKE FLAVORED":



28.     Like Nabisco, General Mills also makes a truthful front-of-the-package disclosure regarding fake carrot. Although its Betty Crocker cake mix does contain real carrot—the ingredients include "carrot powder"—General Mills discloses to consumers on the front of the package that the "carrot" pieces inside the box are "IMITATION CARROT FLAVORED PIECES":



29.     Accordingly, the food industry has largely lived up to consumers' expectations when marketing and selling "carrot cake" products, by either using a substantial amount of real carrot in the products, or providing front-of-the-package disclaimers when the products contain something other than real carrot. The exception, as discussed below, is Hostess.

**B.      Hostess is the One Mainstream Company that Engages in False and Deceptive Marketing with Respect to Carrot Cake Products.**

30.     Hostess manufactures, distributes, markets, advertises, and sells dessert products in the United States.

31.     One of Hostess's products is Carrot Cake Donettes. Hostess sells this product in a variety of packaging and sizes. For example, Hostess sells a package containing 8 packs of three donuts each:



32. Hostess also sells a smaller version of the Product, which contains six donuts:



33. All packages of the Product included the representation, on the front of the package, that the Product contains "CARROT CAKE." Further, the front of all packages of the Product include a cross-section photograph of the donut, revealing what appears to be a carrot cake dessert, with the same texture and color as a product containing a substantial amount of real carrot. The "CARROT CAKE" representation, as well as the cross-section photograph, were uniformly communicated to Ms. Lauchung-Nacarino and every other person who purchased the Product in California. The same or substantially similar representations appeared on each version of the Product packaging during the entirety of the Class Period.

34.     Further, through the transparent packaging of the 6-pack version of the Product, consumers are able to view the donuts, which have the same texture and color as true carrot cake products containing a substantial amount of real carrot. This has also been true throughout the entirety of the Class Period.

35.     In addition, the donuts themselves have the same aroma and texture as true carrot cake products containing a substantial amount of real carrot. This also has been the case throughout the entirety of the Class Period.

36.     As described in detail below, Hostess's advertising and labeling of the Product as having "carrot cake" is false, deceptive, misleading, and intended to induce consumers to purchase the Product, at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that the Product contains a substantial amount of real carrot, just as any "carrot cake" product would—instead of having chemical compounds designed to mimic the taste and color of real carrot cake and carrot.

37.     In fact, the Product either contains no carrot at all, or contains such a miniscule amount of carrot that the Product could not be properly called a "carrot cake" product. The ingredients panel of the product does not list carrots. The panel does say that the product contains "natural and artificial flavor," but that ingredient is listed alongside many other "2% or less" ingredients, such as sodium aluminum phosphate, titanium dioxide, and enzymes.

38.     On information and belief, the "natural flavor" ingredient is a flavoring compound manufactured to mimic the taste of carrot, but that does not contain real carrot as a reasonable consumer understands it, and certainly does not contain real carrot in a sufficient quantity to justify the usage of the term "carrot cake"—a term that consumers reasonably expect means that the product contains a substantial amount of carrot. Further, because the Product does not contain any of the natural sugar that real carrot would have provided, the Product contains more added sugar than a real carrot cake dessert would contain. Accordingly, the Product contains none of the health benefits of real carrot cake or real carrots.

C.     **Hostess's Deceptive Marketing Capitalizes on Consumer Demand for Healthier Desserts.**

39.     Consumers are increasingly health-conscious. At far greater rates than before, consumers seek out healthier foods, and routinely take nutrition information into consideration when selecting and purchasing food items. This is true even for desserts. Although consumers understand that most desserts are not healthy choices, consumers routinely seek out dessert alternatives that, while still delicious and satisfying, are healthier than other dessert options.

40.     No one knows this better than Hostess. In 2012, Hostess filed for Chapter 11 bankruptcy. Industry analysts uniformly placed much of the blame for the bankruptcy on the consumer trend away from junk food in favor of healthy alternatives.

41.     Even before the bankruptcy, Hostess tried to capitalize on consumer demand for healthier desserts, by creating an entire line of 100-calorie snack packs. Hostess continued these initiatives even during the pendency of its bankruptcy. In its bankruptcy Disclosure Statement, Hostess stated that it was engaging in a "Wheat Bread Initiative" whereby it had developed three new wheat bread products, to allow it "to attract and retain health-conscious consumers." *See Old HB, Inc. (f/k/a Hostess Brands, Inc.), et al.*, 12-bk-22052 (Bankr. S.D.N.Y), Dkt. No. 1597 at 40.

42.     Today, Hostess continues to acknowledge that consumers are increasingly skeptical of products containing added sugar, as well as artificial flavors and colors. In its most recent 10-K statement, Hostess stated:

> [P]rolonged negative perceptions concerning the health
> implications of certain food products could influence consumer
> preferences and acceptance of some of our products and marketing
> programs. For example, consumers are increasingly focused on
> health and wellness, and aware of product ingredients such as
> ***added sugar and artificial flavors or colors***. We might be
> unsuccessful in our efforts to effectively respond to changing
> consumer preferences and social expectations. Continued negative
> perceptions and failure to satisfy consumer preferences could
> materially and adversely affect our reputation, product sales,
> financial condition and operating results.

(Hostess Brands, Inc., Form 10-K for FY 2019, SEC file no. 001-37540 (emphasis added).)

43.     As Hostess also knows well, product packaging conveys nutrition information to consumers that they use to make purchasing decisions. As noted by FDA commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Consumers attribute a myriad of benefits to vegetables, and to carrots in particular. Carrots are rich in beta-carotene, which has numerous health benefits, including promoting healthy and well-functioning eyes. Carrots are also a good source of fiber, vitamin K1, potassium, and antioxidants. Further, consumers expect that desserts containing carrots will contain less added sugar than typical desserts.

44.     A reasonable consumer would expect that the Product contains carrot, and that it contains a substantial amount of carrot in order to properly be called "carrot cake." A reasonable consumer would also expect that the designation "carrot cake" on the product packaging means that the dessert is made from actual carrot, rather than a chemical flavoring compound designed to mimic the taste of real carrot. Accordingly, a reasonable consumer would also expect that a "carrot cake" product would contain less added sugar than typical desserts. Unfortunately, the Product does not meet those expectations, because the Product does not contain any substantial amount of carrot, but is instead made from a chemical flavoring compound designed to mimic the taste of real carrot.

45.     Hostess does not disclose on the Product's packaging that the Product is flavored using an artificial, chemical compound manufactured to mimic the flavor of carrot, rather than flavored using real carrot. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Hostess's food labeling claims, especially at the point of sale. Consumers would not know the true nature of the carrot flavoring merely by reading the ingredient label; its discovery requires investigation beyond the grocery store and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the carrot flavor in the Product is not a result of

the presence of real carrot but instead comes from the chemical compound added to make the Product taste like real carrot. That, combined with Hostess's active concealment in representing the Product as being "carrot cake," and not disclosing otherwise, gave the average reasonable consumer no reason to suspect that Hostesses representations on the packages are false, and therefore consumers had no reason to investigate whether the Product contained any substantial amount of real carrot. Thus, reasonable consumers relied on Hostess's representations regarding the nature of the Product. Such reliance by consumers is also eminently reasonable, since food companies are prohibited from making false or misleading statements on their products under federal law.

46.     Hostess intends and knows that consumers will and do rely upon statements on food packaging in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Hostess has done with the "carrot cake" claim.

47.     By marketing and selling the Product as being a "carrot cake" dessert, and by failing to disclose to consumers that the Product does not contain a substantial amount of carrot, Hostess has intentionally deceived consumers while exploiting their demand for healthier desserts.

48.     As one of the world's largest manufacturers of snack foods, Hostess is well-aware of the ingredients its competitors use, and the marketing and packaging practices of its competitors. In particular, throughout the Class Period, Hostess has been aware that its competitors' "carrot cake" products either (i) contain a substantial amount of real carrot, or (ii) prominently disclose to consumers that they do not. Nevertheless, Hostess decided to forge its own path, deceiving consumers despite the fact that its competitors do not. Hostess, of course, did this to gain an edge in the competitive dessert market.

49.     Hostess does not use real carrot in the Product because doing so is more expensive than using a flavoring compound. Nevertheless, Hostess is facing increasing competition among smaller companies and brands (like Simple Mills, Good Dee's, and Backpacker's Pantry) that actually do use carrots in their "carrot cake" dessert products. Hostess knew and intended its

representations to help it compete with competitors that actually do use real carrot. Accordingly, Hostess has an incentive to emphasize the presence of carrot in the Product to appeal to consumers seeking real ingredients instead of other dessert products.

50.     As Hostess knows, consumers are willing to pay a price premium for products made from healthy ingredients and real ingredients—including carrot. Hostess also knows that consumers are willing to pay a price premium for products that contain less added sugar, which should be the case for true "carrot cake" products. Accordingly, by labeling the Product as containing carrot without actually using real carrot (which is more expensive than the chemical flavoring), Hostess has both decreased its expenses and increased its revenues associated with the Product.

51.     Because the market for healthier desserts continues to grow, and because Hostess knows that consumers rely on representations about the Product containing "carrot" and being "carrot cake," Hostess has an incentive to continue to make such false representations, and will continue to do so unless and until it determines that it is no longer profitable to do so, or is enjoined by the Court.

**D.     Hostess's Practices Violate Federal and California Food Labeling Regulations.**

52.     The Food and Drug Administration has defined "natural flavor" to mean "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional." 21 C.F.R. 501.22(a)(3). In other words, a "natural flavor" is one that contains some oil, protein, or essence from a plant or animal. But, a natural flavor bears little resemblance to the actual plant or animal from which it is derived. Rather, natural flavors are made in a laboratory by scientists who make determinations on how to replicate a flavor using chemicals found in nature.

53.     Even assuming that some oil, essence, or other extraction of carrot is used in the creation of the "natural flavor" in the product, that natural flavor is nothing like "carrot" or

"carrot cake" as a reasonable consumer would understand it. Rather, the scientists that created the Product's "natural flavor" would have isolated molecules from the cells and tissue of carrot, or extracted oils or essences from carrot. But because those isolated compounds may not actually taste like carrot, the scientist would have then combined those extractions with any number of other extractions from other plants, animals, or other compounds to create a flavoring substance that tastes like carrot. *See* https://www.scientificamerican.com/article/what-is-the-difference-be-2002-07-29/ (describing the process for creating natural flavors) (last accessed August 21, 2020).

54.     Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the Federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

55.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

56.     Under the FDCA, the term *false* has its usual meaning of "untruthful," while the term *misleading* is a term of art that covers labels that are technically true, but that are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

57.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if

label is false and misleading); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); and California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails to adequately disclose that fact on label).

58.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

59.     Representing that a product is "carrot cake" is a statement of fact, and using this phrase on the labels of packaged food is limited by the aforementioned misbranding laws and regulations.

60.     Hostess's labeling and marketing of the Product violates the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Product's packaging includes the phrase "carrot cake," even though it does not contain carrot (or, at a minimum, does not contain any substantial amount of carrot). Instead, the Product is made from a complex chemical flavoring compound manufactured to mimic the taste of carrot, and created in a laboratory through the isolation of proteins, essences, and oils from the cells and tissues of plants, animals, and/or compounds, and combining them in such a way as to mimic the taste of carrot as a consumer would recognize it. The Product is not made from, and does not contain, carrot cake or real carrot as a reasonable consumer would understand it to mean, nor does the Product contain any of the health benefits that would be obtained if real carrot were used or present. Instead, the Product is just as unhealthy, if not more unhealthy, than other Hostess products that do not even purport to contain any vegetables or other healthful ingredient.

61.     Hostess's marketing, advertising, and sale of the Product violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

        a.   Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or

labeling or any other medium used to directly or indirectly induce the purchase of a food product;

    b.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

    c.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

62.    Hostess's marketing, advertising, and sale of the Product violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

    a.  Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

    b.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

    c.  Section 110740 (a food is misbranded if it contains artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling);

    d.  Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

    e.  Section 110765, which makes it unlawful for any person to misbrand any food; and

    f.  Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

63.    Hostess has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. §§ 101.3, 101.13, 101.14, 101.22, and 101.65 which have been incorporated by reference in the Sherman Law, by failing to include on the Product label the nutritional information required by law.

**PLAINTIFF'S EXPERIENCE**

64.     Ms. Lauchung-Nacarino is a health-conscious high school physical education teacher. When she consumes desserts, she prefers to do so in smaller quantities, and deliberately seeks out desserts that are healthier than typical desserts. For example, Ms. Lauchung-Nacarino prefers desserts that contain real fruits or vegetables, like nuts, trail mix, and corn tortillas.

65.     In 2019, Ms. Lauchung-Nacarino was shopping at a Safeway store in San Francisco. While there, she purchased a package of six Hostess Carrot Cake Donettes (i.e., the smallest package size available at the store). Before purchasing the Product, she saw the "Carrot Cake" representation on the front of the package. Ms. Lauchung-Nacarino reasonably believed this meant that the product contained carrot cake, and that it contained a substantial amount of real carrot. Ms. Lauchung-Nacarino also observed the photograph of the donut cross-section on the front of the package. She reasonably believed the photograph depicted a carrot cake donut, containing a substantial amount of real carrot. She also observed the donuts themselves, by looking into the transparent plastic film on the package. Based on this observation, too, she reasonably believed that the donuts were made of carrot cake and contained a substantial amount real carrot.

66.     Ms. Lauchung-Nacarino purchased the Product because she reasonably relied on each of Hostess's representations described in the paragraph above. Based on these representations, she reasonably believed that the Product was made of carrot cake and contained a substantial amount of real carrot and, therefore, less added sugar than typical desserts. Had she known that the Product does not contain carrot cake, she would not have purchased the product, or at a minimum, would have paid less for it. Had she known that the Product does not contain a substantial amount of carrot, she would not have purchased the product, or at a minimum, would have paid less for it.

67.     Throughout the remainder of 2019, and continuing until approximately early 2020, Ms. Lauchung-Nacarino continued to purchase the Product. (*See* Ex. A.) She mostly purchased 6-pack size, although she also purchased "On the Go" box version. She mostly shopped at the

Safeway located at 1335 Webster St., but she also made some purchases at the Safeway located at 298 King St. (*See id.*) In all, she estimates that she purchased the product dozens of times. (*See id.*) Each of her purchases was based on her belief that the Product was made of carrot cake and contained a substantial amount of real carrot. Had she known otherwise, she would not have purchased the Product at all, or at a minimum, would have paid less for it.

68.     Ms. Lauchung-Nacarino not only purchased the Product because of Hostess's false and misleading representations; she also paid more money for the Product than could have been charged for a similar dessert that was not labeled as containing "carrot cake."

69.     Had Hostess not misrepresented (by omission and commission) the true nature of the Product, Ms. Lauchung-Nacarino would not have purchased it or, at a very minimum, she would have paid less for it.

70.     Ms. Lauchung-Nacarino has been economically damaged by her purchase of the Product because the marketing and labeling of the Product was and is untrue and/or misleading under California law; therefore, the Product is worth less than what she paid for it, and she did not receive what she reasonably intended to receive.

71.     As a direct and proximate result of Hostess's unfair and wrongful conduct, as set forth herein, Ms. Lauchung-Nacarino (i) was misled into purchasing the Product; (ii) received a product that failed to meet her reasonable expectations and Hostess's promises; (iii) paid a premium sum of money for a product that was not as represented and, thus, was deprived of the benefit of the bargain because the purchased Product had less value than what was represented by Hostess; and (iv) ingested a substance that was other than what was represented by Hostess and that she did not expect.

72.     Ms. Lauchung-Nacarino continues to desire to purchase dessert products made from real carrot cake and containing a substantial amount of carrot, including products marketed and sold by Hostess. If Hostess's products were reformulated to contain real carrot, she would likely purchase Hostess's products again in the future. She regularly visits stores where Hostess's products and other dessert products are sold. Because she does not know the formula for Hostess's products and cannot test, before purchasing, whether or not the products contain carrot,

and how much carrot the products contain, she will be unable to rely on Hostess's labels when shopping for desserts in the future absent an injunction that prohibits Hostess from labeling its products with the phrase "carrot cake" unless the product is actually made from and contains a substantial amount of carrot, rather than a flavoring compound designed to mimic the taste of carrot. Because of changes in the market, Ms. Lauchung-Nacarino cannot know, at any given time, which brands are owned by Hostess and whether representations as to the presence of carrot are truthful. Thus, Ms. Lauchung-Nacarino is likely to be repeatedly presented with false or misleading information when shopping for carrot cake products, making it difficult to make informed purchasing decisions. Should Hostess begin to market and sell a new brand or line of carrot cake products, Ms. Lauchung-Nacarino could be at risk for buying another one of Hostess's products in reliance on the same or similar misrepresentations.

## CLASS ALLEGATIONS

73.     Plaintiff brings this action against Hostess, on behalf of herself and all others similarly situated, as a class action pursuant to section 1781 of the California Civil Code. Plaintiff seeks to represent the following groups of similarly situated persons, defined as follows:

> All natural persons who reside in California and, between August 25, 2016 and the present, purchased Hostess Carrot Cake Donettes ("the Class").

74.     This action has been brought and may properly be maintained as a class action against Hostess because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

75.     Numerosity:  Plaintiff does not know the exact size the Class, but she estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

76.     Common Questions Predominate:  This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Product contained carrot cake and that it contained a substantial amount of carrot. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will

establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a)   whether the Product contains carrot cake.

b)   whether the Product contains a substantial amount of carrot.

c)   whether Hostess unfairly, unlawfully and/or deceptively misrepresented that the Product contains carrot cake

d)   whether the use of the phrase "carrot cake" on the Product packaging violated Federal and/or California state law;

e)   whether the advertising of the product as having carrot cake caused it to command a premium in the market as compared with similar products that do not make such a claim;

f)   whether Hostess's advertising and marketing regarding the Product sold to the class members was likely to deceive the class members and/or was unfair;

g)   whether a "carrot cake" claim on product packaging and advertising is material to a reasonable consumer;

h)   whether Hostess engaged in the alleged conduct knowingly, recklessly, or negligently;

i)   the amount of profits and revenues earned by Hostess as a result of the conduct;

j)   whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

k)   whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

77.   Typicality: Ms. Lauchung-Nacarino's claims are typical of the Class because she purchased dozens of packages of the Product – in reliance on Hostess's misrepresentations and

omissions that they contained "carrot cake." Thus, she and the class members sustained the same injuries and damages arising out of Hostess's conduct in violation of the law. The injuries and damages of each class member were caused directly by Hostess's wrongful conduct in violation of law as alleged.

78.     Adequacy: Ms. Lauchung-Nacarino will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Ms. Lauchung-Nacarino also has no interests that are in conflict with, or antagonistic to, the interests of class members. She has retained highly competent and experienced class action attorneys to represent her interests and those of the Class. By prevailing on her own claims, Ms. Lauchung-Nacarino will establish Hostess's liability to all class members. Ms. Lauchung-Nacarino and her counsel have the necessary financial resources to adequately and vigorously litigate this class action, and she and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

79.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Hostess and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

80.     Ms. Lauchung-Nacarino is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class

action.

## CAUSES OF ACTION

Ms. Lauchung-Nacarino does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Ms. Lauchung-Nacarino relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFF'S FIRST CAUSE OF ACTION
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Plaintiff and the Class**

81.     Ms. Lauchung-Nacarino realleges and incorporates the paragraphs of this Class Action Complaint as if set forth herein.

82.     Hostess's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

83.     Ms. Lauchung-Nacarino and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

84.     The Product that Ms. Lauchung-Nacarino (and other similarly situated class members) purchased from Hostess constitutes "goods" within the meaning of California Civil Code § 1761(a).

85.     Hostess's acts and practices, set forth in this Class Action Complain, led customers to falsely believe that the Product contains real carrot cake and a substantial amount of carrot. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Hostess has violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), Hostess's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Hostess's acts and practices constitute improper representations that the goods

they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Hostess's acts and practices constitute improper representations that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Hostess has disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Hostess has advertised goods or services with intent not to sell them as advertised. Finally, regarding California Civil Code §1770(a)(8), Hostess falsely or deceptively markets and advertises that, unlike other manufacturers, it sells "carrot cake" desserts that contain neither carrot cake nor a substantial amount of carrot.

86.     Ms. Lauchung-Nacarino requests that this Court enjoin Hostess from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Hostess is not restrained from engaging in these types of practices in the future, Ms. Lauchung-Nacarino and the other members of the Class will continue to suffer harm.

87.     **CIVIL CODE § 1782 NOTICE.** Ms. Lauchung-Nacarino notices and demands that within thirty (30) days from that date of the filing of this Complaint, Hostess correct, repair, replace or otherwise rectify the unlawful, unfair, false and or deceptive practices complained of herein.

88.     Should the violations herein alleged not be corrected or rectified as required by Civil Code § 1782 within 30 days with respect to all Class Members, Ms. Lauchung-Nacarino will seek to amend this Class Action Complaint to seek, on behalf of each Class Member, actual damages of at least $1,000, punitive damages, an award of $5,000 for each Class Member who is a disabled person or senior citizen, and restitution of any ill-gotten gains due to Hostess's acts and practices.

89.     Ms. Lauchung-Nacarino also requests that this Court award her costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

### PLAINTIFF'S SECOND CAUSE OF ACTION

**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiff and the Class**

90.     Ms. Lauchung-Nacarino realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

91.     Beginning at an exact date unknown to Ms. Lauchung-Nacarino, but within three (3) years preceding the filing of the Class Action Complaint, Hostess made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Product.

92.     Hostess made representations and statements (by omission and commission) that led reasonable customers to believe that the Product that they were purchasing contained carrot cake, and that it contained a substantial amount of carrot.

93.     Ms. Lauchung-Nacarino and those similarly situated relied to their detriment on Hostess's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 30-38 and 45 above. Had Ms. Lauchung-Nacarino and those similarly situated been adequately informed and not intentionally deceived by Hostess, they would have acted differently by, without limitation, refraining from purchasing the Product, or paying less for it.

94.     Hostess's acts and omissions are likely to deceive the general public.

95.     Hostess engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Hostess has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

96.     The aforementioned practices, which Hostess used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Hostess's competitors as well as injury to the general public.

97.     As a direct and proximate result of such actions, Ms. Lauchung-Nacarino and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

98.     Ms. Lauchung-Nacarino seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Hostess from her, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

99.     Ms. Lauchung-Nacarino seeks, on behalf of herself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

100.     Ms. Lauchung-Nacarino seeks, on behalf of herself and those similarly situated, an injunction to prohibit Hostess from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Hostess, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Hostess will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Hostess to which it is not entitled. Ms. Lauchung-Nacarino, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFF'S THIRD CAUSE OF ACTION**
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiff and the Class**

101.     Ms. Lauchung-Nacarino realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

102.     Continuously throughout the last four years Hostess fraudulently and deceptively informed Ms. Lauchung-Nacarino and those similarly situated that the Product contained carrot cake and a substantial amount of carrot. Further, continuously over the last four years, Hostess failed to inform Ms. Lauchung-Nacarino that the Product does not contain carrot cake or a substantial amount of carrot, but instead was made from chemical compounds manufactured to

mimic the flavor and texture of carrot cake and real carrot.

103.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Hostess, not reasonably known to Ms. Lauchung-Nacarino, and material at the time they were made. Hostess knew the composition of the Product, and it knew that the Product was flavored and textured using a chemical compound intended to mimic the taste and texture of carrot cake and carrot. Hostess's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Ms. Lauchung-Nacarino as to whether to purchase the Product. In misleading Ms. Lauchung-Nacarino and not so informing her, Hostess breached its duty to her. Hostess also gained financially from, and as a result of, its breach.

104.    Ms. Lauchung-Nacarino and those similarly situated relied to their detriment on Hostess's misrepresentations and fraudulent omissions. Had she and those similarly situated been adequately informed and not intentionally deceived by Hostess, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing fewer packages of the Product, or (iii) paying less for the Product.

105.    By and through such fraud, deceit, misrepresentations and/or omissions, Hostess intended to induce Ms. Lauchung-Nacarino and those similarly situated to alter their position to their detriment. Specifically, Hostess fraudulently and deceptively induced her and those similarly situated to, without limitation, to purchase the Product.

106.    Ms. Lauchung-Nacarino and those similarly situated justifiably and reasonably relied on Hostess's misrepresentations and omissions, and, accordingly, were damaged by Hostess.

107.    As a direct and proximate result of Hostess's misrepresentations and/or omissions, Ms. Lauchung-Nacarino and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Product.

108.    Hostess's conduct as described herein was wilful and malicious and was designed to maximize Hostess's profits even though Hostess knew that it would cause loss and harm to Ms. Lauchung-Nacarino and those similarly situated.

**PLAINTIFF'S FOURTH CAUSE OF ACTION**
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions**

**Code § 17200, *et seq.*)**
**On Behalf of Plaintiff and the Class**

109.    Ms. Lauchung-Nacarino realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

110.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Hostess has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

111.    In particular, Hostess has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110740, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 101.3, 101.4, 101.13, 101.14, and 101.22, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

112.    In particular, Hostess has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting, both on the packaging and through the appearance of the Product itself, that the Product contains "carrot cake" and a substantial amount of real carrot; and (ii) failing to inform Plaintiff, and those similarly situated, that the Product is made with compounds manufactured to mimic the flavor of carrot cake and real carrot.

113.    Ms. Lauchung-Nacarino and those similarly situated relied to their detriment on Hostess's unlawful, unfair, and fraudulent business practices. Had Ms. Lauchung-Nacarino and those similarly situated been adequately informed and not deceived by Hostess, she would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing fewer packages of the Product, or (iii) paying less for the Product.

114.    Hostess's acts and omissions are likely to deceive the general public.

115.    Hostess engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Hostess has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

116.    The aforementioned practices, which Hostess has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Hostess's competitors as well as injury to the general public.

117.    As a direct and proximate result of such actions, Ms. Lauchung-Nacarino and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.  Among other things, Ms. Lauchung-Nacarino and the class members lost the amount they paid for the Product.

118.    As a direct and proximate result of such actions, Hostess has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

119.    Ms. Lauchung-Nacarino seeks, on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Hostess from Ms. Lauchung-Nacarino, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

120.    Ms. Lauchung-Nacarino seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

121.    Ms. Lauchung-Nacarino seeks, on behalf of those similarly situated, an injunction to prohibit Hostess from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Hostess, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Hostess will continue to violate the laws of California, unless

specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Hostess to which it was not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

A.     On Cause of Action Number 1 (for violation of the Consumers Legal Remedies Act), 2 (for violation of the False Advertising Law), and 4 (for violation of the Unfair Competition Law) against Hostess and in favor of Plaintiff and the other members of the Class as follows:

1.     Declaring that Hostess's use of the phrase "CARROT CAKE" on the Product is unlawful and likely to deceive reasonable consumers;

2.     Enjoining Hostess, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any dessert product from making a "CARROT CAKE" claim unless the product contains a substantial amount of carrot;

3.     Enjoining Hostess, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any dessert product from making other claims about the inclusion of carrot in the product (such as "CARROT CAKE") unless the representation is non-misleading; and

4.     Enjoining Hostess, directly or through any corporation, partnership, subsidiary, division, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any soda to not provide to others the means and

instrumentalities with which to make any representation prohibited by the above. For the purposes of this paragraph, "means and instrumentalities" means any information, including, but not necessarily limited to, any advertising, labeling, or promotional, sales training, or purported substantiation materials, for use by trade customers in their marketing of such product or service.

B.   On Cause of Action Number 1 (for violation of the Consumers Legal Remedies Act) against Hostess and in favor of Plaintiff and the other members of the Class as follows:

    1.   **[RESERVED]**

C.   On Causes of Action Numbers 2 (for violation of the False Advertising Law) and 4 (for violation of the Unfair Competition Law) against Hostess and in favor of Plaintiff and the other members of the Class:

    1.   For restitution pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*;

    2.   For injunctive relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*; and

    3.   For a declaration that Hostess's above-described trade practices are fraudulent and/or unlawful.

D.   On Cause of Action Number 3 (for common law fraud, deceit and/or misrepresentation) against Hostess and in favor of Plaintiff and the other members of the Class:

    1.   An award of compensatory damages, the amount of which is to be determined at trial; and

    2.   An award of punitive damages, the amount of which is to be determined at trial.

E.   On all Causes of Action against Hostess and in favor of Plaintiff and the other members of the Class:

1.    For reasonable attorneys' fees according to proof pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

2.    For costs of suit incurred; and

3.    For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 25, 2020           **GUTRIDE SAFIER LLP**

/s Seth A. Safier
Seth A. Safier, Esq.
Todd Kennedy, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Attorneys for Plaintiff

## **EXHIBIT A**

I, Elena Lauchung-Nacarino, declare:

1.     I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.     I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.     I reside in San Francisco, California. Beginning in 2019, and continuing until approximately early 2020, I purchased Hostess "Carrot Cake" donuts from Safeway stores in San Francisco, California. In particular, to the best of my recollection I purchased the donuts from the Safeway located at 1335 Webster St., as well as from the Safeway located at 298 King St.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed in San Francisco, California on: 8/19/2020

DocuSigned by:

9EC25BF22921490

Elena Lauchung-Nacarino

-1-

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION